IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALFREDO HYLTON,

        Petitioner,

    v.

JERI TAYLOR,

        Respondent.

Civil No. 2:14-cv-01530-BR

OPINION AND ORDER

KRISTINA HELLMAN
Assistant Federal Public Defender
101 SW Main Street
Suite 1700
Portland, OR  97204

    Attorney for Petitioner

ELLEN F. ROSENBLUM
Attorney General
FREDERICK M. BOSS
Deputy Attorney General
KRISTEN E. BOYD
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

    Attorneys for Respondent

BROWN, Judge.

Petitioner, an inmate at the Eastern Oregon Correctional Institution, brings this habeas corpus action pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Court DENIES the Petition for Writ of Habeas Corpus (ECF No. 2).

## BACKGROUND

On November 1, 2004, a Marion County grand jury indicted Petitioner on one count of Attempted Murder, two counts of Kidnaping in the First Degree, and one count each of Assault in the Second Degree, Assault in the Third Degree, and Assault in the Fourth Degree. Resp. Exh. 102. The charges were based upon allegations that Petitioner and his co-defendant, Pete Quismundo, assaulted Petitioner's girlfriend Michelle Simpson, threatened to kill her, and tried to force her into a car.

Petitioner and Ms. Simpson lived together in an apartment which Billie Baller managed. On October 20, 2004, Ms. Baller was awakened by screams and banging on her window at about 3:00 a.m.. She went outside and saw Petitioner and Quismundo assaulting Ms. Simpson. They were on either side of Ms. Simpson and were "smashing" her head into the top part of Petitioner's car and punching her. Ms. Baller heard both men threaten to kill Ms. Simpson, "telling her they were going to cut her up and float her down the river and that nobody would ever miss her." Resp. Exh.

104, pp. 40-41. Ms. Baller screamed for them to stop, and when they did not, she told her daughter-in-law to call 911.

Ms. Simpson got away from Petitioner and Quismundo and ran into Ms. Baller's house. Petitioner and Quismundo got into Petitioner's car and drove away. Once back inside, Ms. Baller saw that Ms. Simpson was "bloody all over" and was holding her ribs.

Police Officer Richard Beal responded to the 911 call. Officer Beal found Ms. Simpson standing in the doorway of Ms. Baller's house with a towel over her left eye. She was crying, was "visibly shaking," and had blood "from the top of her hair running down the side of her head." Res. Exh. 104, p 140. Ms. Simpson told Officer Beal that Petitioner "had beat her and was trying to kill her." Resp. Exh. 104, p. 141. She told Officer Beal that the assault began in her apartment, that she ran from the apartment, and that Petitioner and Quismundo tried to force her into the car "to take her out and kill her." Resp. Exh. 104, pp. 141-42. An ambulance arrived and transported Ms. Simpson to the hospital.

A short time later, another officer stopped Petitioner and Quismundo, and Officer Beal went to the stop location. Beal found a "large kitchen knife" on the front passenger side floorboard of the car. Both Petitioner and Quismundo were arrested and taken to the police station.

Officer Beal went to the hospital to speak to Ms. Simpson again. Ms. Simpson suffered injuries including "two broken ribs,

two fractured ribs, two shattered discs in her vertebra, and she required five stitches." Resp. Exh. 104, p. 77. Ms. Simpson provided Officer Beal additional details about the attack. She told Officer Beal that Petitioner had become angry and assaulted her because she had cheated on him. Petitioner initially hit her with an open hand, but then he became more violent, and he hit her with his fist on the back of her head and her face. Petitioner also stood in front of her and kicked her legs as he questioned her, and kicked her in the shins and in the torso as she lay on the floor. Ms. Simpson told Officer Beal she became "more and more scared" as Petitioner was getting "out of control." Resp. Exh. 104, pp. 146-47.

Ms. Simpson told Officer Beal that Quismundo initially sat on the couch and watched Petitioner assault her, but then he started "egging [Petitioner] on," telling him "You ought to cut her throat" and "let's kill this bitch, man. Come on. Let's make her disappear." Resp. Exh. 104, pp. 148-491. Ms. Simpson reported that Petitioner told her "I am going to kill you and you'll never see your kids again." Resp. Exh. 104, p 149. Because she was afraid for her life, Ms. Simpson looked for a way to escape. When Petitioner and Quismundo went into the kitchen, Ms. Simpson heard a drawer open and heard what she believed to be the sound of a knife pulled out. She told Officer Beal that she bolted for the

door and ran to Ms. Baller's house, where she screamed and pounded on the house to get someone's attention.

Ms. Simpson told Officer Beal that Petitioner was right behind her and grabbed her by the hair and pulled her to his car. Petitioner said "Bitch. Where do you think you're going." Resp. Exh. 104, p. 150. Ms. Simpson pleaded for her life, but Petitioner told her, "You're going for a ride and nobody is going to give a fuck. Come on man. Let's cut this bitch." Resp. Ex. 104, p. 151. Ms. Simpson told Officer Beal she remembered Petitioner holding her, Quismundo hitting her, and her head "bouncing off the top of the car." Resp. Exh. 104, p. 151. When someone screamed, Petitioner and Quismundo released her and she ran into Ms. Baller's house.

Later that same day, Officer Beal contacted Ms. Simpson again at Ms. Baller's house. Ms. Simpson again said Petitioner was upset because she had cheated on him. She told Officer Beal that there was no question in her mind that if Baller had not intervened, "she would have been killed." Resp. Exh. 121, p. 13. Officer Beal also talked to Ms. Baller, who told him she saw Petitioner and Quismundo banging Ms. Simpson's head off the top of the car, and reported hearing Petitioner and Quismundo make statements like: "Come on. Let's cut this bitch. Let's go man." Resp. Exh. 104, p. 163.

Officer Beal interviewed Quismundo twice. The first time, immediately after the incident, Quismundo told Beal he was actually

present to see Petitioner assault Ms. Simpson and that he tried to stop him from injuring her, but then Quismundo said something like "if I would have tried to stop him . . . well you see how big he is . . . I wouldn't be able to help her." Resp. Exh. 121, pp. 9-10. The second time Officer Beal spoke to Quismundo, he told Officer Beal Petitioner had been fighting with Ms. Simpson for about an hour before the police arrived, and he described the events inside the apartment as Petitioner asking questions of Ms. Simpson and then he would hit or kick her. Quismundo mentioned numerous times that he would have stopped Petitioner from assaulting Ms. Simpson, but because of Petitioner's size, he did not.

Before trial, Ms. Simpson did not appear for a grand jury proceeding. The prosecution asked the court to declare her a material witness, and a hearing was held. At the hearing, Ms. Simpson testified that she would appear at trial and wanted to testify against Petitioner. She denied that she had spoken to Petitioner after the incident, even though the state had recordings of her calls to Petitioner, and Ms. Simpson was convicted of perjury for lying under oath at the hearing.

Also before trial, Petitioner's attorney had a private investigator interview Ms. Simpson. Ms. Simpson denied to the private investigator that Petitioner had hit her, and she placed the blame on Quismundo instead.

Petitioner's case was joined with Quismundo's case for trial. At the joint trial, the state presented testimony from three witnesses: Ms. Baller, Ms. Simpson, and Officer Beal.

Ms. Baller testified consistently with what she had reported to Officer Beal, that is, she heard screaming and someone knocking on her window on the night of the altercation, and she saw Petitioner and Quismundo holding Ms. Simpson and heard them "telling her that they were going to cut her up and float her down the river." Resp. Exh. 104, pp. 32-33. Ms. Baller saw both Quismundo and Petitioner holding and hitting Ms. Simpson.

Ms. Simpson's testimony differed dramatically from what she told Officer Beal. She testified she either did not remember making inculpatory statements to Officer Beal about the attack and, if she had made them, they were false. Ms. Simpson blamed the attack entirely on Quismundo and portrayed Petitioner as a bystander. She testified that Quismundo, not Petitioner, beat her and kicked her while they were in the apartment because he was angry at her for cheating on Petitioner. Ms. Simpson testified that Petitioner was asleep, and that after about five minutes she awakened him and he got her a towel and tried to help her to the car. She testified that she did not go to Ms. Baller's house and bang on her window or yell for help, and that she told Ms. Baller to make up the incriminating statements she gave to Officer Beal.

Officer Beal testified about the three conversations he had with Ms. Simpson and relayed the statements she made about the attack as described above. On cross-examination, Quismundo's attorney asked Officer Beal about statements Quismundo had made to him. Officer Beal testified that Quismundo told Beal that he would have intervened but he was scared of Petitioner because of his size, that Quismundo heard Petitioner tell Ms. Simpson he wanted to kill her and she would never see her children again, and that had Quismundo not been there to intervene, he believed Petitioner would have killed Ms. Simpson. Officer Beal also testified that Quismundo told him that Petitioner was the one who actually struck Ms. Simpson when they were in the apartment.

At the close of the state's evidence, both Petitioner and Quismundo moved for judgments of acquittal, which the trial judge denied. Petitioner's attorney then raised another matter with the Court:

> DEFENSE COUNSEL: There is one other matter. It is a pro se matter that I have discussed. [Petitioner] previously -- and I don't think that he agrees with my analysis of the law on it. I think [Petitioner's] belief has historically been that this should not have been a joint trial. I think he feels that the testimony of the co-defendant puts him at a disadvantage or, at least, the purported testimony could. It's kind of a two-on-one situation for him.
>
> I previously, months ago, talked to what his interpretation of the statute and case law was; that I didn't think he had any chance in having severed trials. But, again, even this morning he's written me a note that he wanted me to bring that up to the Court. He still believes that it was inappropriate to have these matters

together, and I just thought I would better do that since he has asked me to do so.

* * *

PROSECUTOR: It is a little late now, I guess. If he is just making his record, he's made his record.

THE COURT: Well, certainly, it is late at this time to file a motion to sever, but I can also indicate that a motion to sever would not have been granted given that these cases clearly arise out of the same incident.

Resp. Exh. 105, pp. 20-21.

Neither Petitioner nor Quismundo testified or put on any evidence in defense. The jury found Petitioner guilty on all charges. After the jury verdict, the case proceeded to a sentencing hearing at which witnesses testified in support of aggravating factors alleged in the indictment. The jury found all of the aggravating factors should be applied to the charges against Petitioner. Based upon the jury's findings, the trial judge imposed upward durational departures from the applicable sentencing guidelines and ordered four of the sentences to be served consecutively for a total of 438 months of imprisonment.

Petitioner directly appealed his convictions, asserting only errors pertaining to his sentence. The Oregon Court of Appeals affirmed in part on the first appeal, and affirmed in a written opinion on appeal after remand, and the Oregon Supreme Court denied review both times. State v. Hylton, 210 Or. App. 104, 150 P.3d 47 (2006), rev. denied, 342 Or. 473, 155 P.3d 51 (2007); State v.

*Hylton*, 230 Or. App. 525, 216 P.3d 899, *rev. denied*, 347 Or. 349, 222 P.3d 30 (2009).

Petitioner then sought state post-conviction relief ("PCR"). Following an evidentiary hearing, the PCR trial judge denied relief. Petitioner appealed, but the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *Hylton v. Coursey*, 260 Or. App. 767, 320 P.3d 675, *rev. denied*, 355 Or. 879, 333 P.3d 333 (2014).

On September 25, 2014, Petitioner filed his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 with this Court. Petitioner alleges three claims for relief:

> **Ground One:** Petitioner was denied his 6th and 14th Amendment rights under the U.S. Constitution to a jury trial.
> **Supporting Facts:** Petitioner was denied his Constitutional right to a jury trial when the sentencing court made factual findings to support the imposition of consecutive sentences rather than have a jury make those findings.
>
> **Ground Two:** Petitioner was denied his right to the adequate assistance of trial counsel under the 5th, 6th, and 14th Amendments to the U.S. Constitution.
> **Supporting Facts:**
> (1) Counsel failed to move to sever the Defendant's trial from that of the co-defendant to avoid the possible admission of co-defendant's hearsay statements;
> (2) Counsel failed to object to the admission of hearsay statements of the co-defendant, which denied Defendant his right to confront his accuser in violation of the 6th and 14th Amendments to the U.S. Constitution.
>
> **Ground Three:** Petitioner was denied his right of confrontation in violation of the 6th and 14th Amendments to the U.S. Constitution.

**Supporting Facts:** A co-defendant's hearsay statements were allowed to be presented before the jury-- without Petitioner being given an opportunity to confront his accuser.

In his Brief in Support of his Petition, Petitioner addresses only the ineffective assistance of counsel claims alleged in Ground Two; Petitioner "submits the remaining claims for this Court's consideration on the existing record." Respondent argues Petitioner is not entitled to relief on the claims alleged in Grounds One and Three because he failed to meet his burden on those claims. Respondent also argues that relief should be denied on both sub-claims alleged in Ground Two because the state PCR court's denial of relief was not contrary to or an unreasonable application of clearly established federal law.[1]

---

[1]In his Brief in Support, Petitioner argues he procedurally defaulted sub-claim (2), but that the procedural default is excused by the ineffective assistance of his PCR trial counsel under *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309 (2012). Respondent does not agree that the claim was procedurally defaulted, in any event, contends Petitioner is not entitled to relief on the merits of the claim. Because the Court finds Petitioner is not entitled to relief on the merits of this claim, the issue of procedural default need not be addressed. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Runningeagle v. Ryan*, 686 F.3d 758, 778 n.10 (9th Cir. 2012) (exercising discretion afforded under § 2254(b)(2) to decline to address procedural default issue where relief denied on the merits), *cert. denied*, 133 S. Ct. 2766 (2013).

**DISCUSSION**

I.   **Ground Two - Ineffective Assistance of Counsel**

   A.   **Legal Standards**

A petition for writ of habeas corpus filed by a state prisoner may not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented."  28 U.S.C. § 2254(d)(1) & (2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011).  A habeas petitioner seeking relief under § 2254 bears the burden of proof. *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388, 1398 (2011).

"Under § 2254(d)(1), a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (citing *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)) (internal quotations omitted).  In *White*, the Supreme Court reiterated the high standard of deference required by § 2254(d): "[t]his Court, time and again, has instructed that the AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief

for prisoners whose claims have been adjudicated in state court.'"
*White*, 134 S. Ct. at 460 (quoting *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013)).

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors.

First, the petitioner must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms, "not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (citing *Strickland*, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Second, the petitioner must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (quotation marks omitted). "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Id*.

**B.   Failure to Move to Sever Petitioner's Trial**

In subpart (1) of Ground Two Petitioner alleges trial counsel provided ineffective assistance of counsel when he failed to move to sever Petitioner's trial from that of his co-defendant. The PCR trial judge denied relief on this claim, noting that the trial court ruled that a "motion to sever was late, but would have been denied anyway." Resp. Exh. 125, p. 1. The PCR trial judge concluded Petitioner did not show prejudice.

In an affidavit filed with the PCR trial court, Petitioner's trial attorney responded to Petitioner's claim of ineffective assistance of counsel:

> 9.   Turning to Mr. Hylton's claims, I did consider filing a motion to sever the trials of Mr. Hylton

and Mr. Quismundo. I was aware of Mr. Quismundo's statement to the police. I did some research into both hearsay objections and severance of the trial. I was aware that ORS 136.060(1) required that jointly charged defendants be tried jointly unless the court concluded before trial that [it] is clearly inappropriate to do so. My research found authority that severance was not required per se when codefendants assert mutually exclusive defenses. *State v. Turner*, 153 Or App 66 (1998); *State v. Coleman*, 130 Or App 656 (1994). I found case law which appeared to support the admission of Mr. Quismundo's statements at trial. *State v. Wilson*, 323 Or 498 (1996); *State v. Nielsen*, 316 Or 611 (1993).

10. I was also aware of *Crawford v. Washington*, 541 US 36 (2004) and issues related to Sixth Amendment Confrontation. I felt that if Mr. Quismundo was an unavailable witness, his statement to the police would not be admissible against Mr. Hylton and severance would be appropriate. I contacted Mr. Quismundo's attorney, Robert Botta, and requested permission to interview Mr. Quismundo. The request was denied. Mr. Botta did advise me that his client's position remained the same, that is, that he had seen Mr. Hylton assault Ms. Simpson but had not intervened out of fear. I specifically asked Mr. Botta if his client was going to testify. I was advised that the decision had not yet been made and probably would not be made until they saw what evidence and testimony was actually presented at trial. It was my impression that they wanted to know what Ms. Simpson was going to say when she testified.

11. Given those circumstances, I did not file a motion to sever the trials because I did not believe it would be successful without the ability to establish Mr. Quismundo as an unavailable witness. As it turned out, Mr. Quismundo decided not to testify and I was advised of this during the trial. In hindsight, I think filing that motion might have been appropriate. I believe my decision at that time was influenced by my analysis of the case itself. In my opinion, there was no doubt that Ms. Simpson had been severely beaten and received significant injuries. There was also no question

that Mr. Hylton had been present when it happened. The statements made by Ms. Simpson and Ms. Baller directly implicated Mr. Hylton. At a minimum, the evidence supported criminal liability on an aid or abet theory. Mr. Hylton's position that he did not know that Mr. Quismundo was assaulting Ms. Simpson over an extended period of time was not believable. I felt strongly that a jury would want to hold someone responsible for the beating and related crimes. In light of Ms. Simpson's interview with my investigator and the change in her description of the events, I felt strategically Mr. Hylton's only chance for acquittal was if the jury had the option of convicting Mr. Quismundo instead.

Resp. Exh. 122, pp. 2-4.

The PCR trial court's decision denying relief on this claim is supported by the record. Petitioner has not established that his attorney should have argued Quismundo would choose to invoke his Fifth Amendment and render himself unavailable to testify or that counsel knew before trial that Quismundo would not be testifying. As noted, counsel contacted Quismundo's attorney before trial, who indicated they had not decided whether Quismundo would take the stand. Moreover, in his opening statement to the jury, Quismundo's attorney said Quismundo would testify and described in some detail what that testimony would say.

In addition, the strategy of Petitioner's counsel regarding the motion to sever was reasonable in light of the facts at the time. As counsel attested, Ms. Simpson's and Ms. Baller's statements to Officer Beal directly implicated Petitioner. In light of the evidence, including the knowledge that Ms. Simpson's testimony at trial would likely diverge from her statements to

Officer Beal, counsel reasonably determined a jury would "want to hold someone responsible," and Petitioner's only chance for an acquittal was if the jury also had the option of convicting Quismundo instead of Petitioner.

Finally, the trial judge ruled that a motion to sever would not have been successful even if it had been timely filed. Under Oregon law, joinder of trial for co-defendants is generally mandated:

> (1) Jointly charged defendants shall be tried jointly unless the court concludes before trial that it is clearly inappropriate to do so and orders that a defendant shall be tried separately. In reaching its conclusion the court shall strongly consider the victim's interest in a joint trial.

Or. Rev. Stat. § 136.060. Review of a court's decision on a motion to sever is to be considered based upon the circumstances as they appear prior to trial, at the time of the motion, and not in light of all of the facts adduced at trial. *State v. Turner*, 153 Or. App. 66, 74 (1998). The trial court's decision here that a motion to sever the trial would not have been granted is a determination of Oregon law which is not subject to habeas corpus relief. *See Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) (state courts have the last word on the interpretation of state law). Because Petitioner cannot establish that a motion to sever would have been granted, he has not established prejudice resulting from the failure to do so. Accordingly, Petitioner is not entitled to habeas corpus relief on this claim.

### C. Failure to Object to Admission of Hearsay Statements

In subpart (2) of Ground Two, Petitioner alleges trial counsel was ineffective in failing to object to the admission of the hearsay statements made by Quismundo in violation of Petitioner's right to confrontation of his accuser. Petitioner argues that Quismundo's statements directly implicated Petitioner as the primary, and most culpable, actor in this criminal episode. According to Petitioner, had the statements been excluded, there is a reasonable probability the jury would not have found Petitioner guilty of Attempted Murder.

The Sixth Amendment guarantees a criminal defendant the right "to confront the witness against him." *Bruton v. United States*, 391 U.S. 123, 137 (1968). In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that when the declarant is unavailable, a testimonial statement is inadmissible unless the defendant had a prior opportunity to cross-examine the declarant. Here, Quismundo did not testify at trial, so he was "unavailable." Quismundo made the statements in question to Officer Beal, so they were testimonial in nature. *See Crawford*, 541 U.S. at 52 ("testimonial" applies at a minimum to police interrogations); *Ocampo v. Vail*, 649 F.3d 1098, 1007-08 (9th Cir. 2011) (there is "no question" but that a witness's statements to investigating detectives were testimonial). Thus, Quismundo's hearsay statements were subject to challenge as a *Crawford* violation.

The fact that Quismundo's hearsay statements were subject to challenge by Petitioner's trial attorney, however, does not end the inquiry. Petitioner still must establish that, had counsel objected and successfully excluded the statements, the outcome of Petitioner's trial would have been different. *See Mata v. Sherman*, Case No. 1:13-cv-01040 DAD MJS (HC), 2016 WL 1642642, at *15 (E.D. Cal. Apr. 25, 2016) (rejecting ineffective assistance of counsel claim based on failure to object to hearsay testimony on Confrontation Clause grounds under *Crawford* because habeas petitioner failed to establish prejudice). Specifically, Petitioner must establish a reasonable probability that, but for the failure to exclude the hearsay statements, the jury would not have found Petitioner guilty.

As explained above, the evidence against Petitioner at trial was substantial. Ms. Baller testified that she saw Petitioner and Quismundo assaulting Ms. Simpson, smashing her head into the top of the car and punching her while they threatened to "cut her up and float her down the river and that nobody would ever miss her. And they just kept doing it." Resp. Exh. 104, pp. 40. She testified that only after she approached the car did Quismundo stop hitting Ms. Simpson and that Quismundo told Petitioner to "just let loose of her, Man. It's not worth it. You are going to jail if you don't quit. And they stopped." Resp. Exh. 104, p. 41.

Officer Beal testified that when he questioned Ms. Simpson the first time, she told him Petitioner "had beat her and was trying to kill her." Resp. Exh. 104, pp. 134-36. He testified that Ms. Simpson repeated this the second time he interviewed her, and provided detail about Petitioner's attack, how she fled when she hear Petitioner getting a knife in the kitchen, and how they followed her out of the house and Petitioner grabbed her by the hair and hit her against the car. Ms. Simpson repeated Petitioner's statement that he was going to kill her and she would "never see [her] kids again." Resp. Exh. 104, pp. 145-151.

Officer Beal testified he interviewed Ms. Simpson a third time, approximately 18 hours after the incident. Ms. Simpson again told Officer Beal that Petitioner was upset because she had cheated on him, and that when she was pleading for her life both Petitioner and Quismundo were telling her that she would never see her children again and that no one was going to care if she was missing. Resp. Exh. 104, pp. 161-162.

Finally, Officer Beal testified that he questioned Ms. Baller upon his arrival at the scene of the incident, and that she told him that she could see Petitioner and Quismundo "banging Ms. Simpson's head off the top of the car, and she heard -- she described both Mr. Hylton and Mr. Quismundo making statements like: Come on. Let's cut this bitch. Let's go man." Resp. Exh. 104, p. 163. Ms. Baller told Officer Beal she also heard Ms. Simpson

pleading for her life, saying "You're not going to put me in the river. I want to see my kids." Resp. Exh. 104, p. 163.

The hearsay statements Quismundo made to Officer Beal were, at best, cumulative of the evidence previously discussed. Quismundo said that Petitioner wanted to kill Ms. Simpson, that he believed Petitioner would have killed her if he had not been there to intervene, that Petitioner told Ms. Simpson "I'm going to kill you" and "You'll never see your kids again," and that Petitioner struck Ms. Simpson when they were sitting on the couch in the apartment. Resp. Exh. 104, pp. 158-60. Considering all of the evidence, the Court finds no reasonable probability of a different outcome had Petitioner's attorney objected to and succeeded in excluding Quismundo's hearsay statements on Confrontation Clause grounds.

## II. Grounds One and Three - Claims Not Addressed by Petitioner

As noted, Petitioner does not provide argument to support the claims alleged in Grounds One and Three. Additionally, Petitioner does not attempt to refute Respondent's argument that these claims do not entitle Petitioner to habeas corpus relief. Accordingly, Petitioner has failed to sustain his burden of demonstrating why he is entitled to relief on his unargued claims. See *Lampert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004) (petitioner bears burden of proving his case); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003) (same).

The court, nevertheless, has reviewed Petitioner's unargued claims and is satisfied that they do not entitle Petitioner to relief. The Oregon appellate court decisions on the claim alleged in Ground One are not contrary to or an unreasonable application of clearly established federal law, and, in any event, Petitioner procedurally defaulted the claim alleged in Ground Three. Accordingly, the Court denies habeas corpus relief on the claims alleged in Grounds One and Three.

## CONCLUSION

For these reasons, the Court DENIES the Petition for Writ of Habeas Corpus (ECF No. 2) and DISMISSES this action.

The Court DENIES a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this ___12ᵗʰ___ day of September, 2017.

_____
ANNA J. BROWN
United States Senior District Judge